**UNITED STATES DISTRICT COURT**

**DISTRICT OF MAINE**

---

**LIANA MARIE SIVE,**

Plaintiff,

v.

**TOFF TOFFOLON,** in his official capacity as Deputy District Attorney for Washington County, State of Maine;

**TOWN OF MACHIASPORT,** a municipal corporation;

**WASHINGTON COUNTY,** a political subdivision of the State of Maine; and

**JESSICA LEWIS,** Animal Control Officer, in her individual capacity,

Defendants.

Civil Action No. _____

---

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES**

**(42 U.S.C. § 1983 — Fourth and Fourteenth Amendments)**

---

**I. NATURE OF THE CASE**

1.  This is a civil rights action under 42 U.S.C. § 1983 arising from a series of unlawful government actions that resulted in the unconstitutional seizure and retention of fifteen of Plaintiff's cats. The challenged conduct includes: deceptive entry into Plaintiff's home; covert warrantless photography of the home's interior; warrantless seizure of property without exigent circumstances; coercion under color of law; and a procedurally defective state hearing.

2. Plaintiff seeks preservation of the seized animals pending adjudication of her federal claims. Plaintiff challenges pre-hearing executive misconduct that occurred before any state judicial proceeding commenced and would exist as constitutional violations regardless of any state court determination. Plaintiff does not ask this Court to review, reverse, or modify the state court's November 17, 2025 order.

3. The continued retention of Plaintiff's cats constitutes an ongoing constitutional violation. Plaintiff's request for prospective injunctive relief does not require this Court to reverse any state judgment. Rather, it requires this Court to address Defendants' conduct: obtaining entry by deception, conducting covert surveillance, seizing property without warrant or true exigency, and retaining that property under coercive conditions.

4. Defendants acted collectively to circumvent the Fourth Amendment's warrant requirement, evade the procedural protections of the criminal process, and deprive Plaintiff of her property without meaningful notice or opportunity to be heard, in violation of the Fourteenth Amendment.

5. Plaintiff brings this action to vindicate her constitutional rights, to prevent further irreparable harm, and to compel the preservation and return of the seized animals, subject to reasonable oversight.

## II. JURISDICTION AND VENUE

6. This Court has federal-question jurisdiction under 28 U.S.C. §§ 1331 and 1343 because Plaintiff's claims arise under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

7. Declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201–2202 and Fed. R. Civ. P. 65.

8. Venue is proper in this District under 28 U.S.C. § 1391(b), because all Defendants reside in Maine and the events giving rise to these claims occurred in Washington County.

## III. PARTIES

9. Plaintiff LIANA MARIE SIVE resides at 2 Pettegrow Point Road, Machiasport, Maine.

10. Plaintiff is an Enrolled Agent authorized to represent taxpayers before the Internal Revenue Service, a small-business owner, and the caretaker of nineteen Ragdoll cats forming a bonded colony.

11. Defendant TOFF TOFFOLON is the Deputy District Attorney for Washington County, Maine. Defendant Toffolon is sued in his official capacity only for declaratory and prospective injunctive relief pursuant to Ex parte Young, 209 U.S. 123 (1908).

12. Defendant TOWN OF MACHIASPORT is a municipal corporation organized under the laws of the State of Maine. The Town employs Defendant Lewis as its Animal Control Officer and is responsible for her training, supervision, and discipline. The Town is sued under 42 U.S.C. § 1983 and Monell v. Department of Social Services, 436 U.S. 658 (1978).

13. Defendant WASHINGTON COUNTY is a political subdivision of the State of Maine. Washington County is responsible for the custody, boarding, and disposition of animals seized under 17 M.R.S. § 1021, and maintains policies governing coordination between

the Sheriff's Office, animal control officers, and the District Attorney. Washington County

is sued under 42 U.S.C. § 1983 and Monell.

14. Defendant JESSICA LEWIS is the Animal Control Officer for the Town of Machiasport.

Defendant Lewis is sued in her individual capacity for damages based on actions taken

under color of state law.

## IV. FACTUAL ALLEGATIONS

### A. Plaintiff's Cats and Temporary Household Conditions

15. Plaintiff owns nineteen cats, all of whom are purebred Ragdolls—a recognized breed

known for docile temperament and bonded-colony behavior.

16. The cats are a multigenerational family descended from two cats Plaintiff acquired: Loki

(the patriarch) and Snegurochka (the matriarch).

17. In 2024, Plaintiff served as the 24-hour, 7-day-a-week caregiver for her dying mother.

During this period, Plaintiff was unable to leave to have her male cats neutered. In 2024,

for the first time in four years, Snegurochka became receptive to mating and became

pregnant. The resulting kittens were accidental, not the product of intentional breeding.

18. In October 2025, Plaintiff was completing a website design contract while recovering

from the year-long caregiving period. The contract had a hard deadline; Plaintiff was

paying rent through this work and could not delay.

19. While Plaintiff briefly traveled to Cape Cod for tax work in mid-October 2025, one

bathroom deteriorated due to the behavior of a cat with chronic litter-box avoidance

4

issues. A bathroom door that Plaintiff had left closed was found open upon her return, and the problem cat had defecated in the bathroom.

20. Upon returning from Cape Cod, Plaintiff worked twenty-hour days on the website project and slept on the bathroom floor to care for newborn kittens that had been born on October 28, 2025.

21. Any clutter or odor in Plaintiff's home was temporary and entirely remediable. Plaintiff completely remediated her residence in approximately ten hours by November 10, 2025.

**B. October 28–31, 2025: Birth of Kittens and Deaths**

22. On October 28, 2025, Plaintiff's cat Squeaks gave birth to seven kittens.

23. On October 30, 2025, one kitten died. On October 31, 2025, a second kitten died. Plaintiff believes both deaths were caused by suffocation, which sometimes occurs when mother cats accidentally lie on or smother newborn kittens.

24. Plaintiff photographed both deceased kittens on a marble surface before giving them to Defendant Lewis on October 31, 2025. The photograph was taken at 10:31 a.m. according to the image metadata. The photograph shows two white newborn kittens with no visible blood on either kitten's body, no visible blood on the marble surface, and no open toothpaste or toothpaste tube anywhere near the kittens. A true and correct copy of this photograph is attached to Plaintiff's Declaration as Exhibit R.

**C. October 31, 2025: Defendant Lewis's Entry by Deception**

25. On October 31, 2025, Plaintiff's landlady Brenda Taylor called what she believed was the East Machias animal shelter to request help with the newborn kittens. The call reached Defendant Lewis.

26. Defendant Lewis arrived at Plaintiff's residence and stated she was there "to help." Defendant Lewis did not announce any investigative purpose. She did not state she was conducting an inspection or investigation. She did not mention any concern about animal welfare beyond the immediate kitten situation.

27. After viewing the mother cat and five surviving kittens, Defendant Lewis asked Plaintiff to surrender Squeaks and her kittens.

28. Plaintiff refused.

29. Defendant Lewis then stated she needed to take the mother cat and five kittens "for examination" and would return them.

30. Plaintiff asked Defendant Lewis directly: "Are you seizing the cats?"

31. Defendant Lewis answered: "No."

32. Based on Defendant Lewis's explicit denial that she was seizing the cats and her explicit representation that she would examine and return them, Plaintiff consented to the limited, temporary removal for examination only.

33. Plaintiff would not have consented if Defendant Lewis had told her she was seizing the cats or that she would not get them back. Plaintiff had already refused to surrender the cats when Defendant Lewis asked.

34. Defendant Lewis took six cats on October 31, 2025: Squeaks and her five surviving kittens. Defendant Lewis never returned these cats. Defendant Lewis never provided any examination results. Defendant Lewis never contacted Plaintiff about the stated purpose of the removal.

**D. October 31, 2025: Covert Photography Without Consent**

35. While Defendant Lewis was inside Plaintiff's residence on October 31, 2025, she photographed the interior of Plaintiff's home.

36. Defendant Lewis did not ask Plaintiff's permission to take photographs. Defendant Lewis did not tell Plaintiff she was taking photographs.

37. While Plaintiff was in the bathroom caring for the kittens—the sole stated purpose of Defendant Lewis's presence—Defendant Lewis used a camera Plaintiff could not see to photograph multiple rooms of Plaintiff's home.

38. Plaintiff was not present in the rooms being photographed. Plaintiff could not have observed, limited, or objected to this activity.

39. Plaintiff did not know Defendant Lewis had taken interior photographs until they were produced in state court on November 17, 2025.

40. Plaintiff did not consent to any photographic documentation of her home. Plaintiff consented only to Defendant Lewis helping with the newborn kittens and temporarily removing Squeaks and her kittens for examination.

**E. October 31, 2025: Deceased Kittens**

41. Plaintiff gave Defendant Lewis the two deceased kittens on October 31, 2025.

42. Defendant Lewis said there would be a cremation cost. Plaintiff agreed to pay for the cremation. Defendant Lewis promised to return the ashes in urns at Plaintiff's request.

43. Defendant Lewis never contacted Plaintiff about how much the cremation would cost, how to pay for it, when the cremation would occur, or how to retrieve the remains.

44. Plaintiff still does not have the cremated remains of her two deceased kittens.

**F. October 31, 2025: Sheriff's Welfare Check**

45. After Defendant Lewis left Plaintiff's residence on October 31, 2025, Defendant Lewis contacted the Washington County Sheriff's Office for a "welfare check" on Plaintiff personally.

46. Sergeant Simpson of the Washington County Sheriff's Office responded to Plaintiff's residence.

47. Sergeant Simpson looked into Plaintiff's residence through the glass door. From that vantage point, Sergeant Simpson could see into the interior of Plaintiff's home, including the living conditions.

48. Plaintiff showed Sergeant Simpson that she was in the process of cleaning the house. Sergeant Simpson observed Plaintiff's active remediation efforts.

49. Sergeant Simpson did not ask to come inside. Sergeant Simpson did not arrest Plaintiff. Sergeant Simpson did not request a search warrant. Sergeant Simpson did not call for emergency animal removal. Sergeant Simpson did not initiate any involuntary mental health proceedings. Sergeant Simpson did not request any follow-up services.

50. Sergeant Simpson left without taking any action.

51. Sergeant Simpson's independent law enforcement assessment confirms that conditions did not warrant emergency intervention. If conditions had truly required immediate action, Sergeant Simpson would have taken action.

**G. November 4, 2025: Notice to Comply Granting Seven Days**

52. On November 4, 2025, Defendant Lewis returned to Plaintiff's residence with a Notice to Comply.

53. Defendant Lewis was accompanied by a state supervisor whom she described as present in a "non-official capacity."

54. On the Notice to Comply form, Defendant Lewis checked only the box for "UNACCEPTABLE SANITATION." Defendant Lewis hand-wrote: "OTHER: Please provide clean & hygienic living conditions." At the bottom of the form, Defendant Lewis hand-wrote: "Inspection in 7 days." A true and correct copy of the Notice to Comply is attached to Plaintiff's Declaration as Exhibit B.

55. The supervisor who accompanied Defendant Lewis asked to see rabies vaccination certificates, which Plaintiff provided. The supervisor handled at least one of Plaintiff's cats. The supervisor offered cost-saving advice: he suggested Plaintiff use wood stove pellets instead of expensive cat litter to save money. The supervisor gave Plaintiff contact information for Ark Animal Shelter (207-546-3484) to help with neutering Plaintiff's three remaining intact male cats.

56. True and correct copies of the supervisor's handwritten notes are attached to Plaintiff's Declaration as Exhibit Q.

57. The supervisor's advice assumed Plaintiff would continue to keep and care for her cats over the long term. This advice is fundamentally inconsistent with any belief that the cats were in "immediate jeopardy" requiring emergency seizure.

58. No one said that Plaintiff's home was dangerous. No one said that Plaintiff's cats were in immediate jeopardy. No one said that emergency action was required.

59. On November 4, 2025, Plaintiff told Defendant Lewis that she was treating her cats for fleas and showed Defendant Lewis the flea spray and topical medications she was using. True and correct copies of photographs showing this food and flea medication are attached to Plaintiff's Declaration as Exhibit M.

60. Plaintiff told Defendant Lewis on November 4, 2025 that only three male cats remained unneutered: Percy, Granger, and Precious.

## H. November 5, 2025: Ex Parte Application Claiming "Immediate Jeopardy"

61. On November 5, 2025—less than 24 hours after Defendant Lewis gave Plaintiff seven days to comply and her supervisor offered routine long-term care advice—Defendant Lewis swore out an ex parte application under 17 M.R.S. § 1021(4) claiming "immediate jeopardy."

62. A true and correct copy of the ex parte application is attached to Plaintiff's Declaration as Exhibit C.

63. No conditions in Plaintiff's home changed between November 4 and November 5, except that Plaintiff had begun cleaning.

64. If Defendant Lewis genuinely believed Plaintiff's cats were in immediate danger of death on November 5, she would not have given Plaintiff seven days to comply on November 4. She would not have offered advice about future litter purchases and future neutering appointments. She would have seized the cats on November 4.

65. Judge David Mitchell signed the ex parte order on November 5, 2025. A true and correct copy of the ex parte order is attached to Plaintiff's Declaration as Exhibit D.

**I. November 6, 2025: Second Seizure**

66. On November 6, 2025, Defendant Lewis arrived at Plaintiff's residence to seize cats pursuant to the ex parte order.

67. Defendant Lewis told Plaintiff that the ex parte document was "not a warrant."

68. Defendant Lewis did not enter Plaintiff's home on November 6, 2025. Defendant Lewis did not observe the interior conditions. Defendant Lewis remained outside approximately thirty minutes.

69. Corporal Stevens of the Washington County Sheriff's Office was present.

70. Corporal Stevens told Plaintiff he would not accept or forward Plaintiff's criminal complaint against Defendant Lewis unless Plaintiff surrendered her cats.

71. Under this coercion, Plaintiff carried each cat by hand into carriers provided by Defendant Lewis.

72. Plaintiff brought out nine cats in carriers.

73. While attempting to place a tenth cat in a carrier, the cat bolted back inside the house.

74. Plaintiff invited Defendant Lewis to enter and retrieve the remaining cats.

75. Defendant Lewis refused and stated: "Nine is sufficient."

76. Defendant Lewis then left, leaving four cats behind in Plaintiff's home.

77. The four cats left behind have always been healthy. They remain with Plaintiff as of the filing of this Complaint.

78. After loading nine cats into carriers in her vehicle, Defendant Lewis began to drive away with the rear hatch of her vehicle open. Corporal Stevens ran toward the vehicle gesturing urgently. Defendant Lewis's assistant closed the hatch while the vehicle was moving.

79. If Plaintiff's home truly posed "immediate jeopardy" to animals, no competent officer would leave four cats behind. Defendant Lewis's statement "nine is sufficient" and her decision to leave four cats behind demonstrates that she did not believe an emergency existed.

**J. November 7, 2025: Criminal Complaint Follow-Up**

80. On November 7, 2025, Plaintiff went to the District Attorney's office. Plaintiff specifically asked staff whether Corporal Stevens had come in to make her complaint against Defendant Lewis.

81. District Attorney staff told Plaintiff that, as far as they knew, Corporal Stevens had not come in on either November 6 or November 7.

**K. November 10, 2025: Complete Remediation**

82. On November 10, 2025, Plaintiff finished cleaning her residence from top to bottom.

83. The task required approximately ten hours of intensive manual labor.

84. Because the November 4 Notice to Comply specified "hygienic" conditions, Plaintiff got down on her knees and scrubbed floors by hand to ensure absolute compliance.

85. Plaintiff took extensive timestamped photographs with metadata documenting: floors scrubbed clean by hand; organized, sanitary living spaces; properly maintained litter boxes; food and water stations; and healthy cats moving freely throughout a safe, clean environment.

86. True and correct copies of these photographs are attached to Plaintiff's Declaration as Exhibit N.

87. One person, working alone for approximately ten hours, restored the entire residence to hygienic standards.

**L. November 11–12, 2025: Defendant Lewis Refuses to Inspect; Demands Cats Without Warrant**

88. Defendant Lewis had written "Inspection in 7 days" on the November 4 Notice to Comply, indicating November 11, 2025.

89. Defendant Lewis did not appear on November 11, 2025.

90. On November 12, 2025, Defendant Lewis returned to Plaintiff's residence with Sheriff's Deputy Natalia Giroux.

91. Defendant Lewis's vehicle hatch was open.

92. Defendant Lewis demanded the four remaining cats.

93. Defendant Lewis did not ask to enter for inspection. Defendant Lewis did not perform any inspection. Defendant Lewis did not assess the remediated conditions.

94. Deputy Giroux told Plaintiff she was present only for peacekeeping and confirmed Defendant Lewis had no warrant.

95. When Plaintiff stated Defendant Lewis needed a warrant to seize cats from inside her home, Defendant Lewis left without entering.

96. If Defendant Lewis genuinely believed Plaintiff's home was dangerous, she would have wanted to see that conditions had improved. Her refusal to inspect suggests her goal was seizure, not animal welfare.

**M. November 13, 2025: Insufficient Notice**

97. On November 13, 2025, at 11:33 a.m., Plaintiff called the state court. The call lasted eight minutes.

98. Later that day at 1:40 p.m., a court clerk called Plaintiff and stated: "you most likely will not get the notification in time."

99. The written notice of hearing was: dated November 13, 2025; metered November 14, 2025; USPS-canceled November 15, 2025 (a Saturday); and delivered November 18, 2025—one day after the November 17 hearing.

100.     True and correct copies of the notice and envelope are attached to Plaintiff's Declaration as Exhibits E and F.

101.     The notice referred only to a hearing on "DEFENDANT'S MOTION TO

DISSOLVE/MODIFY EX PARTE POSSESSION ORDER." The notice made no mention

of any merged hearing or full evidentiary hearing on the merits.

**N. November 17, 2025: The Hearing**

102.     At the commencement of the November 17, 2025 hearing, the prosecutor

(Defendant Toffolon) distributed a one-page document: the September 15, 2025 Standing

Disclosure (Giglio) Order regarding Defendant Lewis.

103.     The Giglio Order states that Defendant Lewis lied to a citizen "on two occasions

to shut her up."

104.     A true and correct copy of the Giglio Order is attached to Plaintiff's Declaration as

Exhibit A.

105.     Plaintiff had no opportunity to read the Giglio Order or prepare before

proceedings began.

106.     Before taking evidence, the court announced that it was merging Plaintiff's motion

to dissolve/modify the ex parte order with a full evidentiary merits hearing under 17

M.R.S. § 1021(6).

107.     Plaintiff had received no prior written notice of this merger.

108.     The court required Plaintiff to choose: proceed immediately or wait until

December 1 while her cats remained in custody.

109.     Plaintiff chose to proceed to mitigate the risk of permanent loss.

110.     The court quashed Plaintiff's subpoena for Amber Barrett (DHHS caseworker) due to timing issues caused by the late notice. True and correct copies of the Motion to Quash and the Subpoena are attached to Plaintiff's Declaration as Exhibits G and H. A true and correct copy of the envelope for the Motion to Quash, showing it was received two days after the hearing, is attached as Exhibit I.

111.     Before any evidence was taken, the judge stated that Plaintiff's phone would be confiscated for three weeks if she attempted to display photographs on it.

112.     Plaintiff could not print evidence because the print shop was closed, the courthouse offers no printing services, and libraries were closed.

113.     The court refused to view Plaintiff's November 10 photographs showing remediated conditions.

114.     The prosecutor refused to look at Plaintiff's photographs and said "you just cleaned it for the hearing" without reviewing timestamps or metadata.

115.     The court admitted photographs taken by Plaintiff's landlady Brenda Taylor.

116.     Plaintiff objected to the admission of these photographs.

117.     Taylor did not testify at the November 17 hearing. Taylor did not authenticate the photographs. Plaintiff had no opportunity to cross-examine Taylor about when the photographs were taken, whether the conditions had been remediated, or her financial interest in the outcome of an unrelated eviction case she is pursuing against Plaintiff.

118.     The photographs were of unknown date. They may have depicted conditions that existed months before the hearing and had long since been remediated.

119.    After the hearing, Plaintiff asked Taylor how the State obtained her photographs. Taylor told Plaintiff she did not provide the photographs to the State, did not know the photographs were being used, and believes they must have been obtained from the eviction case file.

120.    The court admitted Defendant Lewis's covertly-taken October 31 interior photographs—photographs taken without Plaintiff's knowledge or consent while Plaintiff was in the bathroom caring for kittens.

121.    At the hearing, Plaintiff asked Defendant Lewis: "What statute did you cite in your November 5 ex parte application?"

122.    Defendant Lewis could not answer.

123.    The judge told Defendant Lewis from the bench that it was "clear from the order" that she had cited 17 M.R.S. § 1021(4).

124.    Plaintiff then asked Defendant Lewis why she had cited the civil jeopardy statute rather than the criminal cruelty statute.

125.    Defendant Lewis had no answer and acknowledged she did not know what statute she had cited.

126.    At the hearing, Defendant Lewis testified that: ammonia levels in Plaintiff's home had killed the two kittens; a necropsy had been performed; the necropsy found "blood consistent with lung issues."

127.      Defendant Lewis presented no necropsy report. Defendant Lewis presented no air

quality testing or ammonia measurements. Defendant Lewis presented no veterinary

examination results. Defendant Lewis presented no expert testimony.

128.      At the hearing, Defendant Lewis testified that "blood spilled on her" from the

deceased kittens when Plaintiff gave them to her on October 31.

129.      At the hearing, Defendant Lewis testified that the deceased kittens were

"immediately next to open toothpaste."

130.      Plaintiff's photograph of the deceased kittens (Exhibit R), taken at 10:31 a.m. on

October 31, 2025 while Defendant Lewis was present, shows: no visible blood on either

kitten's body; no visible blood on the marble surface beneath them; and no open

toothpaste or toothpaste tube anywhere near the kittens.

131.      At the hearing, Defendant Lewis testified that Plaintiff's cats were "Himalayan"

breed. Plaintiff's cats are Ragdolls, not Himalayans. These are completely distinct breeds.

Plaintiff presented breed documentation with photographs, standards, and pedigrees. The

prosecutor did not correct the false breed testimony.

132.      At the hearing, Defendant Lewis testified about a "dirt floor" in Plaintiff's

basement. Plaintiff's basement floor is concrete, not dirt. Photographs taken on November

24, 2025 document the basement as having a concrete floor throughout the entire space, a

propane wall heater in operation, litter boxes with clean litter, food and water bowls, and

no visible exposed nails or dangerous conditions. True and correct copies of these

photographs are attached to Plaintiff's Declaration as Exhibit J.

133.     Defendant Lewis was never in Plaintiff's basement on October 31, November 4, or November 6, 2025. She had no personal knowledge of basement conditions.

134.     The court cut off Plaintiff's testimony before she could complete her explanation about the basement.

135.     At the hearing, Defendant Lewis testified—without providing any documentary proof, veterinary records, examination dates, or supporting evidence—that at least one cat was "malnourished" and that all cats were "terribly flea infested."

136.     Defendant Lewis did not state when these alleged assessments were made. Defendant Lewis did not produce any veterinary examination reports documenting malnourishment or flea infestation. Defendant Lewis did not identify which cat or cats were allegedly malnourished.

137.     At the hearing, Defendant Lewis testified that four of Plaintiff's cats remained unneutered. This testimony was false. On November 4, 2025, Plaintiff told Defendant Lewis directly that only three cats remained unneutered (Percy, Granger, and Precious). If the cats had actually been examined by a veterinarian after seizure—as Defendant Lewis implied in her testimony—she should have known the correct neuter count from veterinary records.

138.     The judge repeatedly misgendered Plaintiff during the hearing.

139.     At the hearing, Plaintiff offered to accept return of her cats subject to weekly State inspections—announced or unannounced.

140.     The court rejected this proposal without explanation.

141.     The court's ruling allowed Plaintiff to keep four cats while the State kept fifteen cats.

142.     The judge stated that Plaintiff could keep the four cats because Defendant Lewis could not sufficiently identify them.

143.     The court's ruling did not mention or address the Giglio Order documenting Defendant Lewis's prior false statements.

144.     This outcome is logically inconsistent: if Plaintiff's home posed "immediate jeopardy," four cats should not remain; if it was safe, fifteen should not be seized.

145.     From the bench, the court indicated Defendants could dispose of the animals pursuant to statute.

## O. Plaintiff's Attempts to Contact the District Attorney

146.     On November 7, 2025, Plaintiff went to the District Attorney's office at approximately 4:55 p.m. to serve her initial motion. Plaintiff requested to speak with District Attorney Toffolon. Staff said he had just left for court. Plaintiff requested that he call her when he returned. He never returned Plaintiff's call.

147.     On November 10, 2025, at 9:01 a.m., Plaintiff called the District Attorney's office to follow up. Plaintiff was told he would not speak with her.

148.     On November 12, 2025, Plaintiff attempted to contact the District Attorney's office twice—at 11:49 a.m. and at 2:53 p.m. Neither attempt resulted in any communication with Defendant Toffolon. On the second call, DA staff told Plaintiff he would not speak with her until December 1.

149.        Immediately before the November 17, 2025 hearing, Plaintiff attempted to speak
with the prosecutor. He refused to speak with her.

150.        In total, Plaintiff attempted to confer with the prosecutor five times—on
November 7, November 10, twice on November 12, and November 17—and was
rebuffed each time.

151.        True and correct copies of phone records documenting these calls are attached to
Plaintiff's Declaration as Exhibits O and P.

**P. Plaintiff's November 17, 2025 Voicemail to Defendant Lewis**

152.        On the evening of November 17, 2025, immediately following the state court
hearing, Plaintiff telephoned Defendant Lewis at 207-401-0333 (the same number from
which Defendant Lewis had called Plaintiff on October 31, 2025) and left a 55-second
voicemail stating her intent to seek a federal temporary restraining order, requesting no
euthanasia, transfer, adoption, or permanent disposition, and demanding preservation of
all evidence and records.

153.        A true and correct description of this voicemail is set forth in Plaintiff's
Declaration and attached as Exhibit L.

**Q. Current Status**

154.        As of the filing of this Complaint, fifteen cats remain in state custody at unknown
locations.

155.        Four cats remain with Plaintiff: Snegurochka (the matriarch), Aries, and two
others. They are healthy and thriving.

156.     The four cats in Plaintiff's care show no signs of respiratory distress or any symptoms consistent with ammonia exposure, are well-groomed, active, and social, and move freely throughout the house.

157.     Aries mournfully cries every day, missing his brothers Mars and Inquizitous and his sisters. He is visibly sad and distressed by the separation from his siblings.

158.     Plaintiff has received no written order from the November 17, 2025 hearing.

159.     Plaintiff has no information about where the fifteen seized cats are currently located, who has custody of them, or their current health status.

**R. Irreparable Harm**

160.     Maine law authorizes permanent disposition of seized animals, including euthanasia or adoption, after posting and notice. 17 M.R.S. § 1021(6).

161.     From the bench on November 17, 2025, the court indicated Defendants could dispose of the animals pursuant to statute.

162.     Disposition could occur at any moment.

163.     Once Plaintiff's cats are euthanized or adopted out, they cannot be returned.

164.     Plaintiff's cats are unique, irreplaceable property with whom Plaintiff has longstanding bonds.

165.     The cats' condition is crucial evidence. If they remain healthy after weeks in state custody, that directly refutes Defendant Lewis's claim that "ammonia will kill them." If they are destroyed, that evidence is gone forever.

166.    Boarding costs that may exceed $300 per day continue to accrue against Plaintiff, creating coercive pressure to abandon her property rights.

167.    Plaintiff cannot be made whole by money damages. If her cats are permanently disposed of, they are gone forever.

---

## V. COUNTS

---

## COUNT I — FOURTH AMENDMENT: UNLAWFUL ENTRY AND SEARCH

### (42 U.S.C. § 1983 — Against Defendant Lewis)

168.    Plaintiff realleges and incorporates paragraphs 1 through 167.

169.    The Fourth Amendment, applicable to the States through the Fourteenth Amendment, protects against unreasonable searches. A search occurs when the government intrudes upon an area in which a person has a reasonable expectation of privacy.

170.    The interior of a home is entitled to the highest Fourth Amendment protection. Warrantless searches of homes are presumptively unreasonable.

171.    On October 31, 2025, Defendant Lewis obtained entry to Plaintiff's home by representing that she was there "to help" with newborn kittens and by explicitly denying that she was seizing animals when Plaintiff asked.

172.     Consent induced by false representations about the purpose or consequences of entry is not valid consent.

173.     While Plaintiff was in the bathroom caring for the kittens—the sole stated purpose of Defendant Lewis's presence—Defendant Lewis covertly photographed multiple rooms of Plaintiff's home without Plaintiff's knowledge or consent.

174.     The scope of consent is measured by what a reasonable person would have understood the consent to encompass. No reasonable person would understand consent to "help with kittens" as authorization for covert photographic surveillance of one's home.

175.     Defendant Lewis's covert photography exceeded any conceivable scope of Plaintiff's limited consent and constituted an unconstitutional warrantless search.

176.     Defendant Lewis acted under color of state law.

177.     As a direct and proximate result of Defendant Lewis's unconstitutional entry and search, Plaintiff has suffered damages including emotional distress, violation of her privacy, and the use of illegally obtained evidence against her.

178.     Defendant Lewis is liable to Plaintiff under 42 U.S.C. § 1983 for compensatory and punitive damages.

---

## COUNT II — FOURTH AMENDMENT: UNLAWFUL SEIZURE OF PROPERTY

## (42 U.S.C. § 1983 — Against Defendant Lewis)

179.     Plaintiff realleges and incorporates paragraphs 1 through 178.

180.     The Fourth Amendment protects against unreasonable seizures of property. A warrantless seizure of property from the home is presumptively unreasonable absent exigent circumstances.

181.     Defendant Lewis seized fifteen of Plaintiff's cats from Plaintiff's home and curtilage on October 31, 2025 and November 6, 2025 without a warrant.

182.     On October 31, 2025, Defendant Lewis took six cats under the guise of "examination and return," explicitly denying that she was seizing them. She never returned them.

183.     On November 6, 2025, Defendant Lewis seized nine additional cats based on an ex parte civil possession order that she herself admitted was "not a warrant."

184.     No exigent circumstances existed:

a. Sergeant Simpson conducted a welfare check on October 31, 2025 and took no action—no arrest, no warrant request, no emergency removal;

b. On November 4, 2025, Defendant Lewis issued a Notice to Comply granting Plaintiff seven days to remediate, which is incompatible with "immediate jeopardy";

c. Between November 4 and November 5, conditions improved, not worsened, as Plaintiff had begun cleaning;

d. On November 6, 2025, Defendant Lewis stated "nine is sufficient" and left four cats behind in the same home she claimed posed immediate jeopardy;

e. Defendant Lewis refused to inspect Plaintiff's remediated home on November 11 and November 12, 2025;

f. No veterinarian found jeopardy at any time; Defendant Lewis's claims about ammonia, necropsy results, and lung issues were unsupported by documentation.

185.    Defendant Lewis cannot claim good-faith reliance on the ex parte order because she procured it through her own statements. An officer who obtains an order through her own false or misleading statements is not entitled to rely on that order.

186.    The November 6, 2025 seizure was further vitiated by coercion. Corporal Stevens told Plaintiff he would not accept or forward her criminal complaint unless she surrendered her cats. This quid pro quo converted what might have been lawful compliance into unconstitutional coerced surrender.

187.    Defendant Lewis acted under color of state law.

188.    As a direct and proximate result of Defendant Lewis's unconstitutional seizures, Plaintiff has suffered damages including loss of her property, emotional distress, loss of companionship, separation of bonded animals, and ongoing economic harm.

189.    Defendant Lewis is liable to Plaintiff under 42 U.S.C. § 1983 for compensatory and punitive damages.

---

## COUNT III — FOURTEENTH AMENDMENT: PROCEDURAL DUE PROCESS

## (42 U.S.C. § 1983 — Against All Defendants)

190.    Plaintiff realleges and incorporates paragraphs 1 through 189.

191.     The Fourteenth Amendment prohibits the deprivation of property without due process of law. Procedural due process requires, at minimum, notice reasonably calculated to apprise interested parties and a meaningful opportunity to be heard.

192.     The November 17, 2025 state proceeding failed to provide constitutionally adequate process:

a. **Notice failure**: Written notice was dated November 13, metered November 14, mailed November 15 (a Saturday), and delivered November 18—one day after the hearing;

b. **Misleading notice**: The notice described only a hearing on Plaintiff's motion to dissolve/modify the ex parte order, not a full merits trial;

c. **Hearing merger without warning**: The court announced at the hearing that it was merging Plaintiff's motion with a full merits hearing under § 1021(6) without prior written notice;

d. **Hobson's choice**: The court forced Plaintiff to choose between proceeding immediately without preparation or postponing to December 1 while her cats remained seized;

e. **Late disclosure of impeachment material**: The prosecutor produced the Giglio Order documenting Defendant Lewis's prior false statements only at the start of the hearing, despite Plaintiff's earlier attempts to confer;

f. **Denial of cross-examination**: The prosecutor introduced photographs taken by an absent adverse witness (Plaintiff's landlady) who did not testify and could not be cross-examined;

g. **Evidentiary asymmetry**: The court admitted unauthenticated photographs of unknown date from an absent witness while threatening to confiscate Plaintiff's phone if she attempted to show her authenticated, timestamped remediation photographs;

27

h. **False testimony without correction**: Defendant Lewis testified falsely about blood, toothpaste, the basement floor, breed, and neuter count; the prosecutor did not correct the false testimony despite seeing contradicting evidence;

i. **Subpoena quashed**: The court quashed Plaintiff's subpoena for a witness due to timing issues caused by the court's own late notice;

j. **Testimony cut off**: The court cut off Plaintiff's testimony before completion.

193.      These cumulative defects deprived Plaintiff of a meaningful opportunity to be heard and resulted in an erroneous deprivation of her property.

194.      Defendants acted under color of state law.

195.      As a direct and proximate result of Defendants' denial of procedural due process, Plaintiff has suffered damages including deprivation of her property, emotional distress, and economic harm.

196.      All Defendants are liable to Plaintiff under 42 U.S.C. § 1983.

---

**COUNT IV — FOURTEENTH AMENDMENT: SUBSTANTIVE DUE PROCESS**

**(42 U.S.C. § 1983 — Against Defendant Lewis)**

197.      Plaintiff realleges and incorporates paragraphs 1 through 196.

198.      The Fourteenth Amendment protects against arbitrary and conscience-shocking governmental conduct that deprives individuals of their property.

199.    The conduct alleged herein—considered cumulatively—constitutes an abuse of governmental authority:

a. Entry by deception on October 31, 2025;

b. Covert interior surveillance without consent;

c. Seizure of cats under false pretenses ("examination and return");

d. Fabrication of "immediate jeopardy" less than 24 hours after granting seven days to comply;

e. Coercion through the quid pro quo regarding Plaintiff's criminal complaint;

f. Refusal to inspect remediated conditions;

g. Statement that "nine is sufficient" while leaving four cats in allegedly dangerous conditions;

h. False testimony about blood, toothpaste, basement floor, breed, and neuter count.

200.    This coordinated pattern of conduct goes beyond mere negligence or even gross negligence. It demonstrates deliberate disregard for Plaintiff's constitutional rights.

201.    Defendant Lewis acted under color of state law.

202.    As a direct and proximate result of Defendant Lewis's conscience-shocking conduct, Plaintiff has suffered damages including deprivation of her property, emotional distress, and economic harm.

203.    Defendant Lewis is liable to Plaintiff under 42 U.S.C. § 1983 for compensatory and punitive damages.

**COUNT V — MUNICIPAL LIABILITY (MONELL) — TOWN OF MACHIASPORT**

**(42 U.S.C. § 1983 — Failure to Train/Supervise After Notice)**

204.      Plaintiff realleges and incorporates paragraphs 1 through 203.

205.      The Town of Machiasport employs Defendant Lewis as its Animal Control

Officer.

206.      On September 15, 2025, Judge David Mitchell issued a Standing Disclosure

(Giglio) Order formally documenting that Defendant Lewis lied to a citizen "on two

occasions to shut her up."

207.      The Town received notice, or should have received notice, of this judicial finding

regarding Defendant Lewis's dishonesty.

208.      Despite this notice, the Town:

a. Retained Defendant Lewis in a position requiring discretionary evidence-gathering and sworn

statements;

b. Failed to provide additional training on truthful testimony and constitutional requirements for

searches and seizures;

c. Failed to implement additional oversight or supervision of Defendant Lewis's investigative

activities;

d. Failed to discipline Defendant Lewis for her documented dishonesty.

209.    The Town's failure to train and supervise Defendant Lewis after receiving notice of her documented dishonesty constitutes deliberate indifference to the constitutional rights of citizens with whom she would interact.

210.    The Town ratified Defendant Lewis's conduct by failing to discipline her after learning of:

a. Her deceptive entry on October 31, 2025;

b. Her fabricated "immediate jeopardy" assertions;

c. The coercive criminal-complaint quid pro quo; and

d. Her false statements at the November 17 hearing.

211.    The Town's policies, customs, and failures to act were moving forces behind the constitutional violations suffered by Plaintiff.

212.    The Town of Machiasport is liable to Plaintiff under 42 U.S.C. § 1983 and Monell v. Department of Social Services, 436 U.S. 658 (1978).

---

**COUNT VI — MUNICIPAL LIABILITY (MONELL) — WASHINGTON COUNTY**

**(42 U.S.C. § 1983 — Unconstitutional Policy/Custom and Coercive Boarding Practices)**

213.    Plaintiff realleges and incorporates paragraphs 1 through 212.

214.    Washington County operates the regional system that houses, boards, and disposes of animals seized under 17 M.R.S. § 1021. It also maintains policies governing

coordination between the Sheriff's Office, animal control officers, and the District
Attorney.

215.    Washington County has established and maintained practices that result in
constitutional violations, including:

a. **Reliance on ex parte applications without pre-seizure inspection**: The Sheriff's deputies
present on November 6 relied on the ex parte order without independently assessing conditions,
despite Sergeant Simpson's October 31 assessment that no action was warranted;

b. **No warrant requirement for animal seizures**: Washington County permits ACOs to seize
animals from homes and curtilage without judicial warrants based solely on civil "jeopardy"
applications;

c. **Use of uncorroborated ACO statements despite known credibility issues**: The District
Attorney relied on Defendant Lewis's statements despite the September 15, 2025 Giglio Order
documenting her dishonesty;

d. **Coercive quid pro quo regarding criminal complaints**: Corporal Stevens conditioned
acceptance of Plaintiff's criminal complaint on surrender of her cats.

216.    Washington County maintains coercive boarding-cost practices that:

a. Impose daily fees that may exceed $300;

b. Create coercive pressure for property owners to abandon their rights;

c. Operate punitively rather than protectively;

d. Prevent meaningful access to judicial review while animals remain in custody and costs
accrue.

217.      Washington County failed to train its personnel—including sheriff's deputies and prosecutors—on constitutional requirements for animal seizures, the need for warrants or true exigency, and disclosure obligations including Giglio and Brady.

218.      Washington County's policies, customs, and failures to train were moving forces behind the constitutional violations suffered by Plaintiff.

219.      Washington County is liable to Plaintiff under 42 U.S.C. § 1983 and Monell v. Department of Social Services, 436 U.S. 658 (1978).

---

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and grant the following relief:

### A. Declaratory Relief

1. Declare that Defendants' actions—including deceptive entry, covert interior search, warrantless seizure, and denial of procedural due process—violated Plaintiff's rights under the Fourth and Fourteenth Amendments.

### B. Injunctive Relief

2. Order immediate preservation of all fifteen seized cats pending adjudication of this action;

3. Enjoin Defendants from euthanizing, adopting out, selling, transferring, or otherwise permanently disposing of the fifteen seized cats;

4.  Stay the accrual of boarding costs against Plaintiff;

5.  Order disclosure of the location and custodian(s) of the fifteen seized cats;

6.  Order preservation of all records, photographs, veterinary records, necropsies (if any), communications, and evidence relating to the seizures and the November 17 proceeding;

7.  Upon adjudication, order return of Plaintiff's fifteen cats subject to reasonable, non-punitive welfare oversight.

**C. Compensatory Damages**

8.  Award compensatory damages for emotional distress, loss of companionship with seized animals, boarding fees and economic losses, out-of-pocket expenses, and costs resulting from Defendants' conduct.

**D. Punitive Damages**

9.  Award punitive damages against Defendant Lewis in her individual capacity for reckless and intentional violations of Plaintiff's constitutional rights.

**E. Costs and Attorney's Fees**

10. Award costs of suit and reasonable attorney's fees under 42 U.S.C. § 1988.

**F. Further Relief**

11. Grant such other and further relief as this Court deems just and proper.

---

**VERIFICATION**

I, LIANA MARIE SIVE, declare under penalty of perjury under the laws of the United States of America that:

1. I am the Plaintiff in this action.

2. I have read the foregoing Complaint for Declaratory and Injunctive Relief and Damages.

3. The factual allegations contained therein are true and correct to the best of my knowledge, information, and belief.

4. I make this verification willingly, freely, and voluntarily, and understand it may be used as evidence in support of my requests for temporary and preliminary injunctive relief.

Executed on November 25, 2025

at Machiasport, Maine.

/s/ Liana Marie Sive

_____
LIANA MARIE SIVE Plaintiff, Pro Se
2 Pettegrow Point Road
Machiasport, ME 04655
Telephone: (781) 829-3473
Email: lianasive@proton.me